**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

T.J., *et al.*,

                Plaintiff,                           Case No. 1:10-cv-847

v.                                         Judge Michael R. Barrett

WINTON WOODS CITY
SCHOOL DISTRICT

                Defendant.

## <u>OPINION & ORDER</u>

This civil action is before the Court on Plaintiffs' Motion for Summary Judgment. (Doc. 13). Defendant filed a Response in Opposition (Doc. 17), and Plaintiffs filed a Reply (Doc. 20).[1]

In their Motion, Plaintiffs seek reversal of the decision of the Ohio Department of Education's State Level Review Officer ("SLRO"), reinstatement of the decision of the Ohio Department of Education's Impartial Hearing Officer ("IHO"), judgment for Plaintiffs, declaration that Plaintiffs are prevailing parties, and an award of attorney's fees and costs. (Doc. 13, at 40-41). Defendant seeks a denial of Plaintiffs' Motion for Summary Judgment and an affirmation of the SLRO's Decision in all respects. (Doc. 17, at 38).

---

[1]Rather than submit cross motions for summary judgment, Plaintiffs and Defendant agreed that Plaintiffs would submit a motion for summary judgment and Defendant would respond as a means to achieve greater efficiency.

## I. Background

### A. Individuals with Disabilities Act

This is an appeal from a state-level administrative hearing regarding under the Individuals with Disabilities Education Act ("IDEA"). For a state to receive funding under the IDEA, it must ensure that all children with disabilities between the ages of three and twenty-one have access to a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). To this end, an Individualized Education Plan ("IEP") is developed, reviewed, and revised for each child with a disability, and children with disabilities are to be educated in the Least Restrictive Environment ("LRE"), meaning that they are to be educated with children who are not disabled to the maximum extent appropriate. 20 U.S.C. § 1412(a)(4)-(5)(A).

The Sixth Circuit has held that the IEP must provide the student with a "meaningful educational benefit." *Deal v. Hamilton County Bd. Of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004), *cert. denied*, 546 U.S. 936 (2005). The court explained that whether the educational benefit is meaningful is gauged in relation to the child at issue. *See id.* The court also instructed that "[o]nly by considering an individual child's capabilites and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement." *Id.* at 864. However, the court warned "[i]n conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children." *Id.*

"The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child." *School Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471

U.S. 359, 368 (1985). The IDEA places an emphasis on the participation of the parents in developing the child's educational program and assessing its effectiveness. *Id.*

If there is a disagreement regarding an IEP, the IDEA includes a number of "procedural safeguards," which include filing a complaint and requesting a due process hearing before an IHO. 20 U.S.C. § 1415(f)(1)(A). The decision of the IHO may be appealed to an SLRO. 20 U.S.C. § 1415(g)(2). Finally, the decision of the SLRO may be challenged in the appropriate state court or federal district court, and the court may "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2).

## B. Procedural Background

Plaintiffs TJ and VJ are the parents of PJ, a minor. (Doc. 1, ¶ 1). PJ lives with her parents in the Winton Woods City School District ("School District"). (Id., ¶ 6).

On June 3, 2009, the School District filed a request for a due process hearing. (Doc 1-3, "IHO Decision" at 3). The School District sought:

> C. A ruling that the 2009-2010 IEP, with partial resource room placement, is appropriately designed to provide Student with educational benefit in the least restrictive environment;
>
> D. A finding that the School Board has and is complying with state and federal regulations by providing Student with a free appropriate public education in compliance with state and federal requirements; and
>
> E. An Order that the 2009-2010 IEP be implemented in its entirety.

(Doc. 11, Bd. of Educ. Ex.1, at 9).

Plaintiffs opposed these outcomes and, instead, sought a factual finding that Student "is capable of placement in the regular education curriculum without modification" based upon an Independent Educational Evaluation ("IEE"), and, accordingly, sought an order that the IEP team reconvene and develop an IEP

consistent with this finding.   (Doc. 11, Bd. of Educ. Ex. 2, at 4).   In addition, Plaintiffs

sought a finding that the School District has not provided PJ with a free appropriate

public education and an order that School District compensate Plaintiffs for educational

services necessary to ensure that PJ is not permanently disadvantaged as a result of

this failure.  (Id. at 11).

     The IHO held a hearing over the course of nine days during September, October,

November, and December of 2009.[2] (Doc. 1-3, IHO Decision, at 3).   The hearing was

closed on January 11, 2010, when both parties submitted post-hearing briefs.  (Id.)  The

IHO issued a decision on January 28, 2010, in which she found that "[t]he IEP proposed

by [the School District] is designed to provide a FAPE to Student in the [least restrictive

environment ('LRE')]" and that the underlying evaluation of Student was appropriate in

its planning and execution.  (Id. at 14, 16).   However, the IHO also found "[b]ased upon

the evidence presented at hearing, [the School District's] IEP does not does not provide

a FAPE to the extent that it does not sufficiently address behavioral and communication

goals."  (Id. at 15).   The IHO elaborated:

> Although Student has in the past clearly received educational benefit from
> her IEP's and has advanced toward her educational goals, she is currently
> receiving little or no educational benefit in the all regular education setting.
> Her IEP must be modified to include the provision of an effective AAC[3]
> device together with intensive training to use the device for independent
> communication.   Student must be evaluated by an applied behavior

---

[2]The hearing was initially scheduled to begin on August 17, 2009 after the parties agreed
to extend the typical deadline to allow Plaintiffs to obtain an Independent Educational Evaluation
("IEE") of PJ.  (Doc. 1-3, IHO Hearing at 3).   The hearing was continued to provide Plaintiffs with
additional time to obtain counsel.  (Id.)  Counsel for Plaintiffs made an appearance on July 21,
2009 and requested that the hearing be postponed due to scheduling conflicts and the need for
preparation time.  (Id.)  Defendant objected, but Plaintiffs' motion was granted.  (Id.)

[3]An "AAC device" is an augmentative and alternative communication device.

4

specialist to develop strategies to alter Student's attention and related behaviors which impede learning, and appropriate goals and therapies must be introduced to remediate those behaviors. Both school staff and parents must be trained and consistently utilize the AAC device and behavior strategies. Academic course loads should be reduced until such time as communication and behaviors have progressed sufficiently to permit Student to independently demonstrate her cognitive abilities. At that time, she should be reevaluated to determine her functional and educational capabilities and her IEP should be revised accordingly.

(Id. at 16-17). The IHO concluded as a matter of law that the School District should provide a Vantage Lite 84 augmentive and alternative ("AAC") device to PJ and that the School District's speech and occupational therapists should provide intensive one-on-one instruction for a combined period of sixty minutes a day to expedite PJ's training on the device. (Id. at 15). The IHO also noted that parents and staff "should be trained in the application of a least to more prompting hierarchy" with PJ, and that this strategy should be incorporated into PJ's IEP. (Id. at 16).

The School District filed a timely appeal of the IHO's decision because while it agreed with the IHO's decision that the proposed 2009-2010 IEP was designed to provide a FAPE in the LRE, the School District disagreed with the IHO's finding that that the IEP did not provide a FAPE in the LRE to the extent that communication and behavior goals were concerned. (Doc. 1-2, SLRO Decision at 2, 10.)

A review was conducted by the SLRO, who published an opinion on September 3, 2010. (Id. at 48). The SLRO affirmed the IHO's conclusion that the proposed 2009-2010 IEP provided PJ with a FAPE in the LRE and that this IEP was developed based on an appropriately planned and executed triennial multi factored evaluation. (Id. at 3). However, the SLRO held that the IHO erred in other respects. (Id. at 3-4). According to the SLRO, the IHO erred in "contradictorily concluding that the School District's

5

proposed 2009-2010 IEP did not provide PJ a FAPE to the extent that it did not sufficiently address communication and behavior goals." (Id. at 3).

The SLRO found that because the 2009-2010 IEP included a provision for an AAC device, an AAC device was provided for use by PJ, and PJ's parents rejected the use of the AAC device in favor of Facilitated Communication, it was improper for the IHO to conclude that the proposed 2009-2010 IEP required revision to include the use of the Vantage Light 84 AAC device. (Id.) Likewise, the SLRO found that the IHO erred in determining that the proposed 2009-2010 IEP did not contain behavior goals. (Id.) Specifically, the SLRO found that the IHO erred as a matter of law in relying on evaluations presented by Plaintiff's experts regarding appropriate communication assistance and behavior goals. (Id.) The SLRO explained that these evaluations were presented for the first time at the due process hearing that occurred months after the proposed 2009-2010 IEP had been completed and were outside of the scope of the underlying due process complaint brought by the School District. (Id. at 3-4).

Thus, the SLRO reversed the portions of the IHO Decision that determined that the IEP did not provide a FAPE in the LRE with regards to communication and behavioral goals, that the use of the Vantage Light 84 AAC device must be implemented in the IEP, that results and training from future behavior evaluations must be included in the IEP, and that academic course loads should be reduced until communications and behavior have progressed sufficiently. (Id. at 46)

In this Court, Plaintiffs appeal the SLRO's decision based upon errors of law and erroneous factual findings. (Doc. 13, at 7). Specifically, Plaintiffs claim: (1) the SLRO erred as a matter of law when she held that the parents' expert reports were

inadmissible; (2) the SLRO erred as a matter of law when she held that it was improper for the IHO to order IEP modifications; (3) the SLRO erred when she reversed the IHO's factual finding that it is impossible to determine PJ's cognitive abilities; (4) the SLRO erred when she reversed the IHO's factual finding that the School District's proposed IEP did not provide FAPE; and (5) the SLRO erred when she reversed the IHO's factual finding that the School District's Proposed IEP did not provide FAPE in the Communication and Behavior Goals. (Id. at 27-45). Each of these alleged assignments of error are addressed below.

### C. Statement of Facts[4]

#### 1. Background Information

At the time the School District filed its due process complaint in 2009, PJ was fifteen years old and had completed her eighth grade year at Winton Woods Middle School.[5] The School District had been providing special education services to PJ since she was in pre-school. PJ has multiple disabilities including moderate to severe developmental delays, decreased fine motor skills, delays in cognitive functioning, distractibility, and communication delays and deficits. (Doc. 11, Bd. of Educ. Ex. 33-37). Because of her disabilities, PJ cannot express herself orally. PJ can use some non-standard signs and speak a few words which are recognizable to those who know her. (Doc. 1-3, at 4). Over the years, the School District has provided PJ with various AAC

---

[4]Having completed a thorough review of the administrative record, the Court addresses here only the most relevant aspects of PJ's background and the proposed 2009-2010 IEP. This background information is largely undisputed, and therefore the Court refers primarily to the Findings of Fact by the IHO. (See Doc. 1-3, at 4-14).

[5]PJ completed ninth grade at Winton Woods High School, but after ninth grade, her parents withdrew her from the School District.

devices, such as a DynaVox DynaMyte, DynaVox MiniMo, and a Fusion.  (Id. at 6).  PJ has had little success in communicating with these devices.  (Id.)[6]

By all accounts, Plaintiffs are dedicated parents who have always been actively involved in PJ's education.  Through the sixth grade, Plaintiffs and the School District worked together and agreed on each IEP for PJ.  (Id. at 5).  During this time, PJ was educated in a small group or one-on-one setting in the special education resource room for up to 40% of the day.  (Id.)  PJ spent the remainder of the day in a regular education classroom.  (Id.)  However, beginning with the sixth grade IEP, Plaintiffs requested that PJ be placed in the regular education classroom for the entire school day.  (Id.)  The School District agreed, and PJ attended class with a one-to-one aide.  (Id.)

During the sixth and seventh grades, PJ was receiving physical support while completing her school work at home.  (Id. at 7).  This support consisted of supporting PJ's left wrist or forearm or providing hand-over-hand support to PJ as she typed or wrote.  (Id.)  When PJ was in the seventh grade, her teachers noticed that the quality of the work PJ completed at school was poor, while the work she completed at home was perfect or near perfect.  (Id.)  VJ, PJ's mother, was permitted to train school staff on the physical support technique she used at home.  (Id.)  For a period of time, school staff provided PJ with physical support at school.  (Id.)  However, school officials were concerned that the technique did not prevent cuing and was in fact "Facilitated Communication," a technique determined to be improper and unethical by the American Speech-Language-Hearing Association.  (Id.)  Patty D'Arcy, Director of Student

---

[6]The parties disagree as to why PJ has not been able to use these devices successfully. However, this dispute is not relevant to the issues before this Court.

Services for the School District, looked into the issue and observed a demonstration of the technique by VJ. (Id.) D'Arcy determined that the physical support technique being used with PJ was Facilitated Communication, and the staff was instructed to discontinue physical support. (Id. at 8). PJ's academic performance fell after physical support was removed. (Id.)

In May of 2008, Plaintiffs and the School District began working on PJ's IEP for the eighth grade. (Id.) The parties had some difficulty in reaching an agreement, and eventually the School District implemented the IEP without the signature of Plaintiffs. (Id.)

### 2. Proposed 2009-2010 IEP

The dispute between the parties centers on the ninth grade IEP proposed for the 2009-2010 school year.

Part of the development of an IEP includes an evaluation of the student's special education needs. This evaluation occurs every three years, and is called the Multi-factored Evaluation ("MFE"). The MFE results in the Evaluation Team Report ("ETR").

PJ's initial MFE/ETR was completed in 1996, when PJ was in pre-school. (Doc. 11, Bd. of Educ. Ex. 33). Additional MFE/ETRs were completed in 2000, 2003, 2006 and 2009. (Doc. 11, Bd. of Educ. Ex. 35-38). The 2003 MFE contained only two areas in which new direct assessments of PJ were to be completed (academic/preacademic skills and adaptive behavior), and the 2006 MFE was completed via a record review, a summary of current levels of performance and parent and teacher input. (Doc. 11, Bd. of Educ. Ex. 36, at 562; Ex. 37, at 598).

Plaintiffs refused to waive the 2009 MFE assessments in favor of a record review.  (Doc. 11, Bd. of Educ. Ex. 77, at 1239).  The School District agreed to a full reassessment, noting that the last time PJ had been evaluated was when she was six years old (2000 MFE) and that this formal assessment would provide more information about PJ's ability to perform tasks in a regular education environment.  (Doc. 11, Bd. of Educ. Ex. 56, at 1042).  On two occasions, the School District representatives, Plaintiffs, and a facilitator from the Ohio Department of Education met to discuss the assessments that would be given to PJ as a part of the 2009 MFE and the accommodations that would be made by the psychologist, speech therapist and occupational therapist as a part of this testing. (Doc. 11, Bd. of Educ. Exs. 77, 79).[7]  The School District agreed to conduct any additional tests not specifically included in the authorized assessments if Plaintiffs requested that such tests be completed.  (Doc. 11, Bd. of Educ. Ex. 104, Ex. 110, at 2192).

The MFE included tests designed to assess PJ's cognitive functioning, reading skills, mathematics calculation skills, adaptive behavior and vocational skill development.   Dr. Thomas Miele, the school psychologist, administered the Leiter International Performance Scale-Revised test to measure PJ's cognitive functions. (Doc. 11, Bd. of Educ. Ex. 38, at 618).  This test requires only limited motoric responses and does not require verbal responses.  (Id.)  While administering the test, Miele gave PJ breaks every twenty minutes, divided the test into two sessions, removed distractions, and modified the ways in which the response cards could be observed and

---

[7]IHO found that an assistive technology assessment was not completed because Parents did not consent to it.  (Doc. 1-3, IHO Decision, at 9 citing TR 61-62 (testimony of Patty D'Arcy)).

grasped.  (Id. at 621).  PJ earned a Full Scale Intelligence Quotient of 33 on this test, which falls within the severe range of developmental delay.  (Id. at 622).

Miele estimated that PJ's reading level is on the pre-primer to first grade level because PJ correctly pointed to eight out of nineteen words from the Dolch Sight Words List that were read to her.  (Id. at 622-23).  PJ was asked to read a paragraph as her finger was moved along the text at a slow pace as a part of the Gray Silent Reading Test.  (Id. at 623-24).  PJ was unable to answer any of the first five comprehension questions correctly, so testing was stopped according to the test's protocol.  (Id. at 624). Miele estimated that PJ's reading level was at the beginning of first grade.  (Id.)

Miele used the Woodcock-Johnson III-tests of Achievement to test PJ's mathematics skills.  (Id. at 625)  PJ answered only one out of 14 questions correctly, which was the addition of a basic fact with a sum less than five.  (Id.)  This performance is equivalent to a student aged 5 years 3 months.  (Id.)

Miele used the Vineland Adaptive Behavior Scales to elicit information for PJs parents, speech-language pathologist, and intervention specialist concerning PJ's adaptive behavior.  (Id. at 626).  The scores reflected significant delays in PJ's adaptive behavior, and fell within the bottom one percent of PJ's age group.  (Id. at 627).[8]

Finally, PJ's intervention specialist provided information to Miele for the Employability/ Life Skills Assessment.  (Id.)  Miele interpreted PJ's score to indicate that

---

[8]All composite scores, communication domain scores, daily living skills domain scores, and socialization domain scores were within the bottom one percent for PJ's age group.  Using adaptive rules, the score for communication domain measured at the fourth percentile.  (Ex. 38, at 627).

PJ requires a significant level of support in skills that would be needed in a work environment.  (Id. at 628).

Ann Stankiewicz assessed PJ's communication skills, specifically her yes/no question responses, multiple choice question responses, concept comprehension, and grammatical comprehension.  (Id. at 632).  Like Miele, Stankiewicz made accommodations and modifications for PJ which included frequent breaks, extended time to respond, redirection when distracted, verbal encouragement and testing formats with limited motor involvement and exclusively non-verbal responses.  (Id. at 632-33).  Stankiewicz found PJ's yes/no responses to be unreliable,[9] but that PJ could "independently and reliably indicate an answer from a choice of four pictures."  (Id. at 634).  The Bracken Basic Concept Scale, the Peabody Picture Vocabulary Test-III and the Comprehensive Receptive Expressive Vocabulary Test- Second Edition and a test involving singular/plural picture response cards are administered by Stankiewicz, who ultimately found that PJ displays significant developmental delays in communication.  (Id. at 634-35).

Carrie Webb administered assessments related to PJ's ability to complete functional classroom tasks.  (Id. at 636).  After having observed PJ on three occasions, Webb concluded that PJ had delays in fine motor and visual motor skills used daily within the educational setting.  (Id. at 638).

In addition to the assessment completed by Miele, Stankiewicz, and Webb, the ETR contained an evaluation for completed by Matt Alander, PJ's Reading and

_____

[9]Stankiewicz did note that the most accurate yes/no responses were obtained when the yes/no cards were presented with a gap between them and PJ was given an unlimited time in which to respond.  (Ex. 38, at 633).

Language Arts teacher.  (Id. at 639).  Alander used observations, curriculum-based assessment and classroom-based assessment as the basis for his evaluation.  (Id. at 639).  Alander noted that the quality of the work PJ completes in class in very different than the work she completes at home; much of the work she completes at school is non-sensical, whereas the work completed at home is "more complete and grammatically sound."  (Id.)  Alander also noted that PJ can be inattentive.  (Id. at 640)

Based on the MFE, the ETR team concluded that PJ "is an individual who displays significant developmental delays in cognitive functioning, academic achievement, and adaptive behavior.  Delays are also present in fine-motor and visual-motor skills."  (Id. at 641).

The School District presented Plaintiffs with a draft copy of PJ's ETR, which included the results of the MFE administered by school personnel.  (Doc. 11, Bd. of Educ. Ex. 38).  The School District also presented a draft copy of the ninth grade IEP. The IEP outlined the goals in the following content areas: Communication, Mathematical Operations, Reading Comprehension, Fine Motor Skills, and Behavior-Attention to Task.  (Doc. 11, Plaintiffs Ex. 24 at 6-10).  The IEP recommended resource room placement for Reading and Mathematics, and regular education placement (with the help of an assistant) for other academic areas.  (Id.)  The ETR and the IEP were discussed by the parties during a meeting on May 1, 2009.

Plaintiffs disagreed with the results of the ETR. (Doc. 11, Bd. of Educ. Ex. 38, 666).  Plaintiffs maintained that the scope of the original evaluation was too narrow

because it did not include attention, distractibility, impulsivity, or assistive technology evaluations. (Id. at 666-69).[10]

Plaintiffs and members of School District staff met on three occasions to review and revise this IEP. On May 15, 2009, the parties reached an impasse. (Doc. 11, D'Arcy TR. 180-181). On May 26, 2009, the School District sent the proposed ninth grade IEP to Plaintiffs. (Doc. 11, Bd. Of Educ. Ex. 63).[11] Because the parties had not reached an agreement, the School District implemented a stay-put IEP. (D'Arcy TR. 180-181). The School District filed its due process complaint on June 3, 2009. (Doc. 11, Bd. Of Educ. Ex. 1). The due process hearing started September 28, 2009 and ended on December 11, 2009.

In September of 2009, Plaintiffs arranged at their expense for PJ to be evaluated by two independent evaluators: Psychologist Dr. Vanessa Jensen from the Cleveland Clinic and speech and communication expert Dr. Katharine Hill from the University of Pittsburgh. The reports of Dr. Jensen and Dr. Hill were provided to the School District on October 14, 2009, which was during the pendency of the due process hearing. (Doc. 11, Plaintiffs Exs. 29, 30). Drs. Jensen and Hill also testified at the hearing in front of the IHO.

_____

[10]Parents filed four complaints with the Ohio Department of Education alleging procedural errors in the IEP process. (Doc. 11, Bd. of Educ. Ex. 7-10). The IHO found no procedural violations, and Plaintiffs did not challenge this conclusion before the SLRO. (Doc. 1-2, SLRO Decision at 23). Accordingly, the SLRO found that the School District properly complied with the procedural requirements. (Id.) Plaintiffs have not raised any procedural violations before this Court, and therefore these complaints are not at issue in this case.

[11]According to the School District, Parents neither signed and returned nor provided notice of their approval or refusal of the 9th Grade IEP. (Doc. 11, Bd. of Educ. Ex. 1 ¶ 27). Parents maintain that they objected to the 9th Grade IEP at the May 15, 2009 meeting. (Doc. 11, Bd. of Educ. Ex. 60).

Before the IHO and the SLRO, Plaintiffs presented Drs. Jensen and Hill's evaluations as evidence that the IEP did not provide a FAPE. The IHO summarized Plaintiffs' position as follows:

> [The School District's] testing was inappropriate in its planning, execution and conclusions. The testing did not sufficiently accommodate Student's many physical, neurological and cognitive disabilities, and the testing results were therefore invalid. [Plaintiff's] evaluations demonstrate a better measure of Student's cognitive abilities. Student is capable of grade level work with physical support. Petitioner's IEP which provides for resource room at well below grade level does not provide a FAPE, and the Complaint should therefore be dismissed.

(Doc. 1-3, IHO Decision at 2).

## II.  Analysis

### A. Standard of Review

A party that is aggrieved by the findings and decision made by a state educational agency regarding an IDEA claim has the right to bring a civil action in a district court of the United States. *See* 20 U.S.C. § 1415(i)(2)(a). The district court shall receive the records of the administrative proceedings, hear additional evidence at the request of a party, and, based on the preponderance of the evidence, grant appropriate relief. 20 U.S.C. § 1415(i)(2)(c). This case is before the Court only upon the administrative record.[12]

When the Court hears a case brought under the IDEA, the Court must afford due weight to the state administrative proceedings. *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). The Sixth Circuit has explained that "a

---

[12]Neither party requested to present additional evidence, and therefore the court can safely assume that the parties intended for the case to be decided on the basis of the administrative record. *Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*, 197 F.3d 793, 799 (6th Cir. 1999) (citing *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)).

district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)). This standard of review is referred to as "modified" *de novo*. *See, e.g. Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 609 (6th Cir. 2006) (citing *N.L. ex rel. Mrs. C. v. Knox County Sch.*, 315 F.3d 688, 692 (6th Cir. 2003). "In a case involving a motion for summary judgment, the court should still apply modified *de novo* review, but must ensure that there are no genuine issues regarding the facts essential to the hearing officer's decision." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch*, 208 F.3d 560, 560 (6th Cir. 2000).

As part of its review, the Court conducts a two-fold inquiry: (1) whether the procedural requirements outlined in the IDEA were met; and (2) if the IEP was developed according to these procedural requirements, whether it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-207. When considering procedural matters, the Court must strictly review the IEP process for compliance, but need not necessarily invalidate an IEP for a mere technical deviation from the prescribed procedures. *See Dong ex rel. Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999)). Greater deference is given to the school district's IEP determination when the Court finds that the procedures outlined in the IDEA have been followed. *See id.*

As the Sixth Circuit explained in *Deal v. Hamilton County Board of Education*, substantive matters are treated differently:

> Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe ex rel. Doe v. Metropolitan Nashville Public Schools,* 133 F.3d 384, 387 (6th Cir. 1998), neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Thomas v. Cincinnati Board of Education,* 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley,* 458 U.S. at 206).

392 F.3d at 849. The amount of deference the Court affords to substantive state administrative findings is correlated to the degree to which the findings are based on educational expertise. More weight is afforded to determinations in which educational expertise is relevant, but less weight is afforded to determinations in which educational expertise is not relevant, because the district court judge is just as well situated as the administrator to make such determinations. *See McLaughlin v. Holt Public Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). When educational expertise is essential to the findings of a state administrative agency, the court has an obligation to afford special deference to such findings. *Nack ex rel. Nack*, 454 F.3d at 609 (citing *N.L. v. Knox Cty. Sch.*, 315 F.3d 688, 692 (6th Cir. 2003)).

When reviewing the findings of both an IHO and a SLRO, the Court must defer to the SLRO's decision. *See Burlovich*, 208 F.3d at 567 (citing *Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor*, 208 F.3d 560, 641 (6th Cir. 1999)). However, while the court must give the SLRO deference in matters requiring educational expertise, the Court will not "second guess" credibility determinations made by the IHO, who was best situated to assess the credibility of testifying witnesses. *B.H. v. W. Clermont Bd. of Educ.*, 788 F.Supp. 2d 682, 693, (S.D. Ohio 2011) (citing *Bd. of Educ. of the City Sch. Dist. of the City of Cincinnati v. Wilhelmy*, 689 F.Supp. 2d 970, 987 (S.D. Ohio 2010)).

17

B. **Burden of Proof**

The School District agrees that it bore the burden of proof when the parties were before the IHO and SLRO.  However, the School District argues that before this Court, Plaintiffs bear the burden.  Plaintiffs disagree and argue that the burden does not shift to the parents just because they filed a pleading styled as motion for summary judgment.

The Court agrees that the burden is not placed on Plaintiffs because this matter is before the Court upon Plaintiffs' motion.  However, the Court does conclude that Plaintiffs bear the burden of proof because Plaintiffs are the party challenging the SLRO decision.

The IDEA does not specify which party bears the burden of persuasion at the district court level or at the administrative hearing level.  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).  In *Schaffer v. Weast*, the Supreme Court concluded that at the administrative level, the party seeking relief bears the burden of proof.  546 U.S. 49, 62 (2005).  Several circuit courts have concluded that at the district court level, the party challenging the administrative decision bears the burden of persuasion as to each claim challenged.  *Ridley Sch. Dist.*, 680 F.3d at 270 (3d Cir. 2012) (citing *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010); *Marshall Joint Sch. Dist. No. 2 v. C.D.*, 616 F.3d 632, 636 (7th Cir. 2010); *District of Columbia v. Doe*, 611 F.3d 888, 897 (D.C.Cir. 2010)).  As one of these courts has explained, "the relevant consideration is the outcome of the administrative proceeding, not which party requests an administrative hearing."  *Ridley Sch. Dist.*, 680 F.3d at 270, n.3.

Therefore, even though the School District filed the complaint which triggered the due process proceedings, Plaintiffs are seeking relief from the decision rendered in

18

those proceedings.  Therefore, the Court concludes that Plaintiffs bear the burden of proof in this matter.

### C. **Parents' Independent Examiner Reports**

Plaintiffs argue that the SLRO erred as a matter of law when it ruled that the reports and testimony of the independent examiners which they presented at the due process hearing were inadmissible.

In the "summary" section of her written decision, the SLRO explained why the IHO's reliance on the evaluations of Drs. Jensen and Hill was improper:

> The Parent evaluations relied upon by the IHO, that were brought to the School District's attention only in the course of a protracted due process hearing and months after the completion of the proposed 2009-2010 IEP, should have properly been first considered by the IEP Team when completed rather than presented and adopted by the IHO as a hindsight solution that was acceptable to the Parents after months of impasse and resistance to the School District's lengthy and accommodating efforts to develop a 2009-2010 IEP with the Parents.  Thus, the IHO erred as a matter of law in relying on the after-the-fact evidence in an improper hindsight review rather than considering whether the proposed IEP was appropriate at the time it was drafted.

(Doc. 1-2, SLRO Decision at 4).

Plaintiffs argue correctly that the applicable law does not prohibit expert evidence at the IHO hearing.  A parent may obtain an independent evaluation and submit the evaluation at the due process hearing:

> (3) Parent-initiated evaluations
>
> If the parent obtains an independent educational evaluation at public expense or shares with the school district an evaluation obtained at private expense, the results of the evaluation:
>
> (a) Must be considered by the school district of residence, if it meets district criteria, in any decision made with respect to the provision of FAPE to the child; and

(b) May be presented by any party as evidence at a hearing on a due process complaint under Subpart E of Part B of the IDEA regarding that child.

Ohio Admin. Code § 3301-51-05. However, a full reading of the SLRO's written opinion reveals that timing was not the primary reason for finding that the IHO erred in relying upon the evaluations of Drs. Jensen and Hill. Instead, the SLRO found that the evaluations were unreliable and the IHO relied upon the evaluations for an improper purpose.[13]

First, the SLRO found that the evaluation of Dr. Jensen could not be relied upon because it did not comport with IDEA and OAC evaluation regulations. (Doc. 1-2, SLRO Decision at 17). The IHO had reached the same conclusion, pointing out that by allowing the use of physical support during testing, Dr. Jensen rendered the standardized tests "in effect nonstandard." (Doc. 1-3, IHO Decision at 19).[14] Plaintiffs

---

[13]The Court notes that setting aside the issue of reliability and whether the testing was in statutory compliance, the SLRO did not find that the evaluations were inadmissible. Instead, the SLRO's decision was based a determination regarding the proper weight to be given to the evaluations.

[14]After reviewing the requirements for evaluations under the IDEA, the IHO explained:

The requirements of the statutory provision quoted above are essentially that testing must be performed by qualified personnel using appropriate, valid and reliable measures which assess all areas of suspected disability utilizing a variety of assessment tools. This was accomplished in this case. The accommodations urged by Respondents which include permitting multiple answers and physical support as utilized by Dr. Jensen, render the standardized tests in effect nonstandard and do not comport with the requirements of 20 U.S.C. §1414(b)(3)(A)(v). The testing was appropriately administered by qualified personnel. The problem with the testing in this case is not in the selection or administration of the test, but in Student's inability to effectively communicate the extent of her cognitive abilities by virtue of her interfering behaviors and inability to generate independent communication. While the testing performed by Dr. Jensen lends additional insight into Student's ability, it cannot be accepted as appropriate educational testing under 20 U.S.C. §1414(b). It was clearly not

do not challenge this conclusion, but instead argue that the IHO was entitled to use the parts of the evaluations which were not based on Facilitated Communication.  However, the SLRO rejected this notion: "Dr. Jensen's evaluation of [PJ] was unreliable insomuch as Dr. Jensen used Facilitated Communication, and thus, her results were accordingly found to unreliable, yet the IHO relied upon Dr. Jensen's behavioral recommendation."  (Doc. 1-2, SLRO Decision at 17).  Moreover, the SLRO also rejected using Dr. Jensen's evaluation for purposes of establishing a behavioral recommendation: "Dr. Jensen's expertise was in evaluating [PJ's] cognitive potential to introduce in dispute of the MFE results; she was neither a behavioral nor a communication specialist."  (Id.)  Therefore, the SLRO concluded that Dr. Jensen's evaluation could not be used either to rebut the School District's measurement of PJ's cognitive ability or question the behavioral goals contained in the proposed IEP.

With regards to Dr. Hill, the SLRO noted that her recommendations regarding the use and training for AAC were made during the due process hearing.  (Doc. 1-2, SLRO Hearing at 9).  The SLRO explained that parents are not permitted to submit new independent evaluations at the hearing for the purpose of introducing new proposals and information.  (Id. at 16).  The SLRO distinguished these evaluations from independent evaluations which are offered to rebut a district's argument that their proposed IEP provides a FAPE.  (Id.)  The SLRO explained that in this case:

> Dr. Hill was not offering any opinion or testimonial evidence regarding the design and implementation of the MFE, the cognitive results of the MFE, or the resulting proposed IEP, nor was Dr. Hill aware of the Parent's

conducted in accordance with the instructions of the producers of the tests as required by the statute.

(Doc. 1-3, IHO Decision at 19).

insistence on Facilitated Communication or their refusal to consent to an assistive technology evaluation in the MFE evaluations.

Thus, the IHO erroneously relied upon the testimony of Parent's expert Dr. Hill, who did not evaluate [PJ] until September, 2009, to conclude that without an effective communication device for independent communication, [PJ's] cognitive abilities could not be determined.  The School District could not have known about the possibility of another AAC device that might have been acceptable to parents to use in [PJ's] May 2009 MFE evaluations when the Parents themselves did not even know about the device until meeting with Dr. Hill in the Fall of 2009, long after impasse had occurred between Parents and School District over the 2009-2010 proposed IEP resulting in this due process action.  Indeed Parents had participated in and consented to the MFE design in February, 2009 and had rejected the AAC Devices that were available to [PJ].

(Doc. 1-2, SLRO Decision at 31) (citations to administrative record omitted).

The Court finds the SLRO properly determined that the IHO erred in relying upon the evaluations of Drs. Jensen and Hill in concluding that the IEP proposed for the 2009-2010 school year does not does not provide a FAPE to the extent that it does not sufficiently address behavioral and communication goals.  The Court finds that the SLRO was correct in concluding that these evaluations amounted to new proposals and information which should have properly been first considered by the IEP Team.  As the SLRO explained, "[t]o determine that the School District failed to provide FAPE because it did not consider information not available to them at the time of the IEP was developed runs counter to the structure of the IDEA."  (Doc. 1-2, SLRO Decision, at 18). This conclusion is echoed by the Fourth Circuit in *Schaffer v. Weast*, 554 F.3d 470 (4th Cir. 2009).  Following remand from the Supreme Court, the Fourth Circuit determined that post-hearing evidence of a tenth-grade IEP was not dispositive of whether an eighth-grade IEP was appropriate under IDEA.  *Id.* at 478.  This Court recognizes that *Schaffer* is distinguishable because the issue there was whether a district court properly

refused to hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), which provides that a district court "shall hear additional evidence at the request of a party." *Id.* at 475.  However, the Court finds that the principles the Fourth Circuit outlined in *Schaffer* are equally applicable here and support the SLRO's decision.[15]

The Fourth Circuit explained that "[i]t is inevitable that additional information will become available after an administrative hearing-be it changes in the child's academic performance, improvements in diagnostic techniques, newly available education programs, and so on."  *Id.* at 476.  The court explained that IDEA recognizes these changes and "affirmatively requires school districts to create and analyze new information-which would become fodder for endless litigation if district courts were compelled to give significant weight to new evidence whenever it arose."  *Id.*  The court identified several negative effects of the resulting litigation.  First, the court stated that "prolonged litigation and a lack of finality disserve the IDEA's purpose of including disabled students in the public education system as quickly as possible."  *Id.*  Second, the court warned that "perpetual litigation due to the introduction of new evidence also would force school districts to divert scarce resources to the already substantial costs of IDEA litigation."  *Id.*  The court then added one final danger:

---

[15]The Court acknowledges that in *Schaffer*, the Fourth Circuit relied upon *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773 (1st Cir. 1984).  The Sixth Circuit has declined to take the narrow view adopted by the First Circuit regarding additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii).  *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 850 (6th Cir. 2004).  Instead, the Sixth Circuit has "taken an expansive view of the scope of additional evidence that may supplement the administrative record."  *Id.*

turning district court review of IEPs into a second-guessing game that will only harm the interests of the disabled children the statute was intended to serve.  Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034; *Burlington [v. Dep't of Educ.*, 736 F.2d 773, 788 (1st Cir. 1984)]; *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).  But this prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created.  *Cf. Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1994) (affirming the district court's conclusion that evidence of a later IEP was "irrelevant to the issue of the appropriateness of" prior IEPs).  Judicial review would simply not be fair to school districts, whose decisions would be judged in hindsight "based on later assessments of a student's needs at [a] later point in time."  Brief for Appellees at 28; *see also Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995).  And more importantly, if services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information.  This scenario is the exact opposite of what Congress intended when it provided for regular review and revision of IEPs, *see* 20 U.S.C. § 1414(d)(4)(A), and it would do little to help the interests of disabled children.

*Id.* at 477.  By way of analogy, the Court finds this analysis instructive and concludes that the SLRO was correct in finding that the new proposals and information submitted by way of the independent evaluations of Drs. Jensen and Hill could not be used to cast doubt upon whether the IEP proposed for the 2009-2010 school year provided a FAPE.

### D.  Ability of the IHO to Order IEP Modifications

The IHO concluded that the following modifications should be made to the IEP proposed for the 2009-2010 school year:

Her IEP must be modified to include the provision of an effective AAC device together with intensive training to use the device for independent communication.  Student must be evaluated by an applied behavior specialist to develop strategies to alter Student's attention and related behaviors which impede learning, and appropriate goals and therapies must be introduced to remediate those behaviors.  Both school staff and parents must be trained and consistently utilize the ACC device and

24

behavior strategies.  Academic course loads should be reduced until such time as communication and behaviors have progressed sufficiently to permit Student to independently demonstrate her cognitive abilities.  At that time, she should be reevaluated to determine her functional and educational capabilities and her IEP should be revised accordingly.

(Doc. 1-3, IHO Decision at 16-17).  Plaintiffs argue that the IHO could properly make such determinations regarding methodology.

There are two types of IDEA cases which can arise: (1) those involving a decision between two alternative methods of educating a disabled student; and (2) those involving a decision about the extent to which a disabled student should be mainstreamed, or in other words, educated alongside non-disabled children.  *Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir. 1983).  When the dispute is simply one of methodology, "the Supreme Court has emphatically stated that such questions should be left to the states."  *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 673 (6th Cir. 2003) (citations omitted); *see also Rowley*, 458 U.S. at 207 ("In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States.").

However, the SLRO explained: "Notwithstanding the definition of methodology and whether the recommendations for assessments, evaluations, and trainings by the IHO were considered 'methodologies,' the IHO erred in ordering specific evaluations, IEP modifications, and AAC device instruction and placement decisions that were required to be first considered by the School District and the IEP team, with deference given to the District and the IEP team."  (Doc. 1-2, SLRO Decision at 20).  Therefore, the SLRO reversed the IHO's decision requiring that "the School District provide training and one on one instruction on the recommended AAC devise 'endorsed' by [Plaintiffs]

25

and applied behavior evaluation and training."  (Id. at 21).

Therefore, as the SLRO explained, the error in this case did not turn on a determination regarding methodology.  Instead, the SLRO found that the independent evaluations needed to be brought to the IEP team to consider whether the recommendations are appropriate.  Because the Court has concluded that this finding was not in error, the Court also concludes that the SLRO was correct to reject the modifications which were based upon the independent evaluations.

**E.  Actual Determination of PJ's Cognitive Abilities**

Plaintiffs also challenge the SLRO's conclusion regarding whether there can be an actual determination of whether PJ is able to learn at a ninth grade level, or whether PJ is incapable ninth grade work because she is mildly to moderately mentally retarded and moderately to severely cognitively delayed.

The IHO concluded that PJ's "cognitive abilities at this time remain unknown." (Doc. 1-3, IHO Decision at 22).  The IHO explained that "[m]uch of her past school performance, and presumed cognitive capability, was apparently the actual capability of Mother who has unknowingly conveyed her own knowledge through Facilitated Communication."  (Id.)  The IHO concluded: "Although its results may be too low in their assessment of Student's cognitive functioning, that result is in significant part due to Student's interfering behaviors and lack of ability to communicate independently.  Until such time as those issues are remediated, more accurate testing is likely not possible." (Id. at 14-15).

However, the SLRO found that "the IHO created an unsustainable inconsistency in her Decision by concluding first, in multiple places in her Decision, that the MFE

26

testing was appropriate in it [*sic*] planning and execution, thus properly evaluating [PJ] and then going on to conclude that accurate testing is not possible due to [PJ's] 'lack of ability to communicate independently.'"  (Doc. 1-2, SLRO Decision at 27).[16]  The SLRO explained:

> While the IHO found that an independent communication device would be critical to any accurate assessment or measurement of [PJ's] cognitive abilities, at the time that the School District filed it due process complaint, the Parents were repeatedly insisting on the use of only Facilitated Communication during the MFE testing.  Further, the Parents would not consent to an assisted communication evaluation as part of the MFE and ignored the IHO's order for an Independent Education Evaluation to video tape the physical support techniques used by the Parents.
>
> Thus, the School District cannot be found to have been unable to accurately measure cognitive abilities when their multiple offers for the use of an ACC device, including an assistive technology evaluation during the MFE, were soundly rejected and resisted by the Parents who continued to insist on Facilitated Communication as the only communication support for [PJ].

(Id. at 29) (citation to administrative record omitted).[17]  The SLRO noted that after the September 2009 evaluation by Dr. Hill, Plaintiffs "seem to have abandoned any objection to the School District's withdrawl and resistance to Facilitated Communication."  (Id. at 28).  Yet, as the SLRO explained, "[m]erely because a reliable expert, six months after the MFE, presented to the IHO in the course of the due process hearing a possible alternative to the Facilitated Communication that *could have* resulted

---

[16] The SLRO noted that on SLR Appeal, Plaintiffs did not object to the IHO's decision that the MFE evaluation was appropriately designed and executed.  (Doc. 1-2, SLRO Decision at 24).

[17] Plaintiffs have not challenged the finding that the physical support used with PJ was Facilitated Communication or that they ignored the IHO's order for an independent evaluation. While Plaintiffs might object to the characterization that they "soundly rejected and resisted" multiple offers for the use of an ACC, they have not challenged the finding that they refused to include an assistive technology evaluation as part of the MFE.

in a more accurate statement of [PJ's] cognitive abilities, it is speculative and not sufficient or timely evidence to support the IHO's conclusion that [PJ's] cognitive abilities could not have been determined by the School District in their appropriately designed MFE." (Id. at 31) (emphasis in original) (footnote omitted).

The Sixth Circuit has explained that "the 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Burilovich*, 208 F.3d at 566 (citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990)). The court explained that "federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." *Id.* Therefore, "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Id.* at 567. In addition, "when there is a conflict between the holdings of the local and state hearing officers, the court must defer to the state hearing officer's decision in reviewing the record on appeal." *Id.*

This Court concludes that the determination regarding whether the MFE made an actual determination of PJ's cognitive abilities is a matter which falls within the presumed educational expertise of the state and local hearing officers. In this instance, the conflict between the IHO and the SLRO means that the Court must defer to the SLRO's decision. Upon review of the SLRO's decision on this issue, the Court concludes that Plaintiffs have not carried their burden of showing that the SLRO's

28

finding should be set aside. The Court notes that there was evidence in the administrative record that the 2009 MFE testing was valid. For instance, as part of the testing, PJ's adaptive skills were measured and were consistent with her IQ score. (Doc. 1-2, SLRO Decision at 26). In addition, PJ's cognitive skills were measured in 2000, and these results were consistent with the 2009 results. (Id.) Moreover, both the IHO and the SLRO found that the School District's MFE was appropriate in its planning and execution. Accordingly, the Court does not find that the SLRO erred when she reversed the IHO's factual finding that PJ's cognitive abilities were not known as a result of the May 2009 MFE.

**F. Whether the School District's Proposed IEP Provided FAPE in the LRE**

Before the SLRO, Plaintiffs did not challenge the IHO's conclusion that "the IEP provides a FAPE in the LRE." (Doc. 1-2, SLRO Decision at 11). As the SLRO noted, the dispute between the parties was not centered on placement in the regular classroom, but instead was in terms of the preferred mode of communication. (Id. at 34-35). Therefore, there was no disagreement with regards to the IHO's findings that PJ "is not capable of obtaining educational benefit in all regular education classes until such time as she learns an effective means of independent communication" and that "[t]he IEP appropriately places Student primarily in one on one and small group settings with some general education placement for electives and gym to allow for social interaction with regular education students." (Doc. 1-3, IHO Decision at 15). However, the SLRO found that the IHO's finding that the "IEP provides a FAPE in the LRE" was inconsistent with the IHO's finding that the "IEP did not provide FAPE to the extent that it does not sufficiently address either behavior or communication goals." (Doc. 1-2,

29

SLRO Decision at 36).

The SLRO resolved this inconsistency by reviewing the administrative record and considering the IHO Decision in its entirety.  (Id.)  The SLRO concluded that the IHO intended to find that the School District provided PJ with a FAPE.  The SLRO explained:

> The most reliable interpretation of the IHO's inconsistent conclusions, that FAPE *was* provided in the LRE and also that FAPE *was not* provided to the extent of the communication and behavior goals, is that the IHO was intent on assisting the parties in resolving their impasse and dispute regarding the appropriate communication device, particularly in light of her conclusion that while other AAC devices could be used, the Vantage Lite 84 AAC device "should be utilized since Respondents endorse its use," and that "*both* school staff and parents must be trained and consistently utilize the AAC device."  IHO Decision at 15, COL ¶ 7; IHO Decision at 17 (emphasis added).  Furthermore, and significantly, in support of reading that communication goals were not intended to defeat the conclusion that the School District had provided a FAPE but rather to facilitate a consensus and resolve a dispute, the proposed 2009-2010 IEP and previous IEPs *had*, in fact, provided for AAC devices for [PJ] and [PJ] had been provided with an AAC device since the 2003-2004 school year, despite strong resistance from the Parents; thus an IEP modification for an AAC device was not necessary.  IHO Decision at 6, FOF ¶ 6.  Likewise behavior goals addressing attention and distractibility were included in the proposed IEP, again making it redundant to conclude that the IEP required modification for [PJ's] "interfering" behavior goals.

(Id. at 36-37) (emphasis in original).  Therefore, the SLRO affirmed the IHO's conclusion that the proposed 2009-2010 IEP was designed to provide a FAPE in the LRE.  (Id. at 38).

Plaintiffs' arguments to the contrary are focused on the behavior and communication goals contained in the IEP.  The Court notes that Plaintiffs' arguments are largely undercut by the Court's conclusion that the SLRO was correct to reject the modifications to behavior and communications goals.  However, the SLRO analyzed whether communication and behavior goals were sufficiently addressed in the proposed

2009-2010 IEP.  (Id. at 38-44).

The SLRO noted that the recommendation regarding the Vantage Lite 84 AAC device is "completely consistent" with the proposed 2009-2010 IEP communication goals because the goals include the provision of an assistive technology device.  (Id. at 42).  The SLRO explained that the IEP Team could decide to include the Vantage Lite 84 AAC device in the IEP without an IEP amendment.  (Id.)  Similarly, the SLRO noted that the IEP does provide for behavior goals to address PJ's attention and distractibility interfering behaviors.  (Id.)  Moreover, the SLRO noted that the IHO did not find that the independent examiners, Drs. Jensen and Hill, "disagreed with any particular communication or behavior goals to the extent that the proposed IEP could not provide a FAPE."  (Id. at 43).  Therefore, the SLRO reversed the IHO's conclusion that the proposed 2009-2010 IEP did not provide a FAPE to the extent that it did not sufficiently address behavior and communication goals.  (Id. at 44).  Accordingly, the SLRO reversed the IHO's modifications to the IEP.  (Id.)

The Court finds no error in the SLRO's analysis or conclusion.  The Sixth Circuit has instructed: "[A] court's review 'must focus primarily on the District's proposed placement, not on the alternative that the family preferred.'"  *Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 506 (6th Cir. 1998) (quoting *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987).[18]  Here, other than the specific modifications to the behavior and communication goals, the parties were in agreement that the proposed IEP was reasonably calculated to enable PJ to receive educational benefits.

---

[18]The Court presumes that even though this directive is stated in terms of "placement," the Sixth Circuit would extend its application to cases where a the appropriateness of a program is being challenged.

Accordingly, the Court finds that Plaintiffs have not carried their burden of showing that the proposed 2009-2010 IEP failed to provide PJ with a "meaningful educational benefit" gauged in relation to PJ's potential.

## III.  Conclusion

Plaintiffs' Motion for Summary Judgment (Doc. 13) is hereby **DENIED**. Accordingly, the SLRO's Decision is affirmed in all respects.  This matter shall be **CLOSED** and **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED**.

_____/s/ Michael R. Barrett_____
United States District Judge